# APPENDIX 4

Page 1

1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                     Judge Laurel M. Isicoff
3
4    IN RE:
5    CARDIAC MANAGEMENT SYSTEMS,   CASE NO: 08-19029-BKC-LMI
             Debtor.
6    _____  /
7    KENNETH A. WELT,          CASE NO: 10-3060-BKC-LMI
             Plaintiff,
8    vs
     BDO SEIDMAN, LLP,
9            Defendant.
     _____  /
10
11           MOTION TO COMPEL ARBITRATION AND TO STAY
             DISCOVERY, OR IN THE ALTERNATIVE MOTION TO
12           STAY (14)
13
                     OCTOBER 18, 2010
14
15
16           The above-entitled cause came on for hearing
17   before the HONORABLE LAUREL M. ISICOFF, one of the
18   judges in the UNITED STATES BANKRUPTCY COURT, in and
19   for the SOUTHERN DISTRICT OF FLORIDA AT LARGE, at 51
20   SW 1st Avenue, Miami, Dade County, Florida, commencing
21   at or about 3:00 p.m., on October 18th, 2010, and the
22   following proceedings were had:
23
24           Reported by: Carmen E. De La Cruz
25

Page 2

```
1                 APPEARANCES:

2         GENOVESE JOBLOVE & BATTISTA, P.A., by

          DAVID C. CIMO, Esquire

3         On behalf of Kenneth A. Welt, Plaintiff.

4

          GREENBERG TRAURIG, by

5         JOHN B. HUTTON, Esquire

          On behalf of BDO Seidman, LLP, Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            THE COURT:  Okay.  Cardiac.  Welt versus

2    BDO Seidman.  I will take appearances starting, I

3    guess, with Mr. Hutton since he's up at the podium.

4            MR. HUTTON:  Thank you, Your Honor.

5    John Hutton on behalf of Defendant, BDO.

6            MR. CIMO:  Your Honor, David Cimo from

7    Genovese Joblove & Battista on behalf of the

8    Plaintiff, Chapter 7 Trustee, Kenneth Welt.

9            THE COURT:  Okay.  All right.  So I have

10   reviewed the complaint, I have reviewed the motion to

11   compel arbitration, I have reviewed the plaintiff's

12   response and I have reviewed various and sundry cases

13   that were cited by the parties in their papers.

14            So, Mr. Hutton, since this is your motion

15   I'll ask you if there's anything you'd like to add or

16   repeat or highlight or pound into my head in case I

17   didn't understand it from your motion before I start

18   asking you the questions that I have?

19            MR. HUTTON:  Certainly, Your Honor.  We

20   believe that the issue before the Court is whether

21   this lawsuit by the Trustee, asserting that BDO failed

22   to conduct audits in accordance with general accepted

23   -- generally accepted accounting standards in the

24   United States as a representative that it would do in

25   the engagement letters is subject to arbitration as

Page 4

1    provided in those engagement letters.

2           We believe this is essentially a breach of

3    contract and professional negligence claim that is

4    cast as a fraudulent transfer claim, by alleging that

5    because BDO failed to conduct a proper audit, the

6    $215,000 in fees that it was paid over four years was

7    a fraudulent transfer.  In other words, because it was

8    a bad audit or there were bad audits over the four

9    year period, that the debtor did not, Cardiac

10   Management Services, did not receive reasonably

11   equivalent value.

12          The -- we would point out to the Court and

13   I want to highlight that the arbitration clause in the

14   litigation -- in the engagement letters before the

15   Court is very broad and provides that any claims

16   relating to BDO's audits are required to be resolved

17   in arbitration.  It's the arbitration provision that

18   the trustee admits in his response on Page 5 is very

19   broad.  And although we believe the trustee has

20   attempted to draft around the arbitration agreement by

21   attaching a fraudulent transfer label to his

22   allegations, the -- we believe the trustee's equitably

23   estopped from objecting to arbitration because his

24   claims are based upon the auditing services BDO

25   provided pursuant to those very same engagement

1  agreements, including whether BDO conducted audits

2  that failed to meet professional standards, and

3  whether the trustee is entitled to a refund of the

4  fees paid as a result.

5         Your Honor, we point out that the

6  equitable estoppel argument is not even addressed by

7  the trustee in the response, but it is a doctrine that

8  applies here both under recent Supreme Court authority

9  and under Eleventh Circuit authority.  And we think

10  the doctrine does require these claims be arbitrated.

11         THE COURT:  Okay.

12         MR. HUTTON:  I wanted to highlight some of

13  the procedural history of this case because I think

14  it's also important here.  As alleged in the

15  complaint, CMS filed bankruptcy Chapter 11 on June

16  30th, of 2008.

17         THE COURT:  Uh-huh.

18         MR. HUTTON:  That's about two years and

19  four months ago.

20         THE COURT:  Uh-huh.

21         MR. HUTTON:  On October 20th, of 2008

22  Cardiac sold substantially all of its assets pursuant

23  to a Section 363 sale, that's almost two years ago to

24  the day.

25         THE COURT:  Uh-huh.

Page 6

1          MR. HUTTON:   And on November 13th, of 2008

2     the case was converted to Chapter 7, and Welt was

3     appointed as trustee just under two years ago.  So

4     this case is certainly not in its infancy as suggested

5     by the trustee, and all of the assets were sold two

6     years ago.  And then about a year and a half after

7     Welt was appointed, on May 13th Welt sued BDO in State

8     Court and we've attached a copy of that amended

9     complaint as I think it's Exhibit 2, to our motion.

10          THE COURT:  Uh-huh.

11          MR. HUTTON:   And I wanted to focus on that

12     because the allegations in that amended complaint in

13     the State Court are virtually identical to the factual

14     allegations made in the adversary complaint in this

15     Court to support the fraudulent transfer theories.

16     That is, in particular, the allegations that are

17     contained in the State Court pleading, the heart of

18     the pleading, in Paragraphs 39 to 46(j), that those

19     are the allegations pursuant to which the trustee

20     alleges in the State Court that BDO alleges what the

21     alleged duties of BDO were under the engagement

22     agreements and what omissions were allegedly committed

23     by BDO.

24          On June 2nd of 2010, BDO moved to compel

25     arbitration in State Court and that is scheduled to be

Page 7

1   heard by the State Court on November 1st.

2            THE COURT:  Uh-huh.

3            MR. HUTTON:  After commencing the State

4   Court action on May 13th, and by the way, the State

5   Court action based upon those same allegations that

6   are asserted here --

7            THE COURT:  Uh-huh.

8            MR. HUTTON:  -- a failure to comply with

9   GAAS, based upon the same allegations the trustee

10  asserts in the State Court theories of professional

11  negligence and aiding and abetting a breach of

12  fiduciary duty by the officers of CMS, and the trustee

13  seeks $6 million in damages, including the $215,000 in

14  fees that it seeks in this adversary complaint in this

15  Court, and that's in Paragraph 65 of the amended

16  complaint in the State Court.  And the -- and after

17  commencing that State Court action back on May 13th of

18  this year, 11 days later the trustee commenced the

19  adversary complaint in this Court on May 24th, of

20  2010.

21            As I noted, the main allegations that

22  support the State Court action are repeated verbatim

23  in this adversary proceeding.  If Your Honor compares

24  Paragraphs 39 to 46(j) in the State Court complaint

25  with Paragraphs 30 to 37(j) in the adversary

Page 8

1    complaint, you'll see that they're identical.

2            And again, the trustee alleges that BDO

3    was retained to conduct audits for CMS, that BDO

4    represented in engagement letters that it would

5    conduct audits in accordance with generally accepted

6    accounting standards and that BDO's audits did not

7    comply with those professional standards.

8            Another interesting procedural step I

9    wanted to highlight is that as part of the adversary

10   complaint that was filed in this Court, the trustee

11   asserted a jury trial demand.  And the very same day

12   that the adversary complaint was filed, the trustee

13   moved to withdraw the reference based on jury trial

14   demand and the trustee noted in that motion to

15   withdraw reference that he was not consenting to a

16   jury trial in the Bankruptcy Court.

17           And, in fact, if you look at the motion to

18   withdraw reference that was filed here, the trustee

19   actually, I think, mistakenly mischaracterizes the

20   claims that are asserted in this case as professional

21   negligence and aiding and abetting.  He recognized it

22   as a mistake, but I think it does highlight the fact

23   that there is substantial overlap and a substantial

24   identity of the factual allegations that are made so

25   it was easy for the trustee to make that mistake.  And

1   we do think that at its heart, the claims in this

2   adversary proceeding are in the nature of breach of

3   contract and fraudulent -- and professional negligence

4   claims.

5            Of course, the District Court shortly

6   thereafter remanded back to this Court for pretrial

7   proceedings as is customary.

8            THE COURT:  Uh-huh.

9            MR. HUTTON:  But the point here is that

10  this case will not be tried in this Court in any

11  event.

12           THE COURT:  Uh-huh.

13           MR. HUTTON:  And I think that's relevant

14  when we get later to the McMahon factors and the

15  Electric Machinery factors.  Insofar as one of the

16  purposes or the goals of the Bankruptcy Code is

17  consolidation of proceedings in one forum.  This case

18  is not going to be tried in the Bankruptcy Court in

19  any event.

20           THE COURT:  Well, we're just a unit of the

21  District Court, Mr. Hutton.  So, it's just venue not

22  jurisdiction; right?

23           MR. HUTTON:  No, but it is -- I think when

24  the cases talk about consolidation in one forum, they

25  talk about the specialized expertise that the

Page 10

```
 1   Bankruptcy Court has to deal with bankruptcy issues on
 2   an everyday basis.
 3               THE COURT:  Who is your judge?
 4               MR. HUTTON:  Pardon?
 5               THE COURT:  Who is the judge in the
 6   District Court?
 7               MR. HUTTON:  In this case that decided and
 8   remanded, it was Cecilia Altonaga.
 9               THE COURT:  I see she closed the case.
10               MR. HUTTON:  Yes, she closed it.
11               THE COURT:  Uh-huh.
12               MR. HUTTON:  I don't know that if
13   ultimately if this Court doesn't send this case to
14   arbitration and keeps the case whether it goes
15   ultimately to her or some other judge.
16               THE COURT:  Right.
17               MR. HUTTON:  I don't know.
18               THE COURT:  Well, I'll give you a hint.
19   If it does go back to her, she says that unless you
20   stand before her and say we're ready to pick the
21   trial, she sends it back to Bankruptcy Court.  So,
22   don't have any pretrial motions left.
23               Okay.  So you -- but let me ask you
24   something, in terms of the focus of the proper
25   exercise by the Bankruptcy Court, the proper deference
```

Page 11

1    of the Court to the FAA --

2                MR. HUTTON:  Uh-huh.

3                THE COURT:  -- does it matter whether the

4    bankruptcy jurisdiction is being exercised by the

5    District Court or the Bankruptcy Court?  Should it

6    make a difference?  If the focus is on the tension

7    between the Bankruptcy Code and the FAA, should it

8    make a difference which judge is hearing the case?

9                MR. HUTTON:  I think insofar -- again,

10   this goes to the trustee's argument about there being

11   an inherent conflict between sending this case to

12   arbitration and goals and purposes of the Bankruptcy

13   Code.

14               THE COURT:  Right, but I'm saying if the

15   goals and the purposes of the Bankruptcy Code, are you

16   suggesting that the District Court is not as well

17   versed in the bankruptcy -- well, are you suggesting

18   that ostensibly the District Court is not as well

19   versed in the Bankruptcy Code or its ability to

20   enforce the purposes of the Bankruptcy Code as is the

21   Bankruptcy Court?

22               MR. HUTTON:  No.  What I'm suggesting,

23   Your Honor, is I think when the cases focus on -- and

24   quite candidly, I've not seen a case expressly address

25   the issue to withdraw of reference or District Court

Page 12

1  familiarity.  Usually as I've seen it focuses on the

2  familiarity of the Bankruptcy Court with bankruptcy

3  issues.

4          THE COURT:  Right, but the focus is not

5  the familiarity of the Court.  The focus is the

6  purpose of the Bankruptcy Code and whether that

7  purpose is being realized through the Bankruptcy

8  Court, the District Court or the Circuit Court.  We

9  focus on the purposes, not the Court itself; correct?

10          MR. HUTTON:  Well, I think the Court -- in

11  my view, the Court does matter in the fact that this

12  is not going to be heard and consolidated in the

13  Bankruptcy Court.  That's just one factor, but I think

14  insofar as --

15          THE COURT:  But there are really only two

16  factors that the Eleventh Circuit tells us to look at;

17  isn't it?

18          MR. HUTTON:  Well, I think there's a

19  number of considerations just -- you know, I'll jump

20  ahead to that argument, but I think there are a number

21  of considerations that the Court looks at to determine

22  whether there is an inherent conflict and that may be

23  whether there's an issue that pertains to a plan issue

24  that is important to resolve right away in the

25  Bankruptcy Court.

1          THE COURT:   Uh-huh.

2          MR. HUTTON:   There is that $10 million

3   issue that was in, I think, the Fourth Circuit case

4   that is cited by the trustee.   It was important in

5   that case in White Mountain, it's a Fourth Circuit

6   case, it's important in that case to determine whether

7   a $10 million advance could be treated as debtor

8   equity because whether it would, was treated as one or

9   the other, impacted the ability of the debtor to

10  formulate a plan.

11         THE COURT:   Uh-huh.

12         MR. HUTTON:   So I think that was a factor.

13  It's one of the, you know, one of the few -- I think

14  that by looking at instances like that where the Court

15  decided that there was an inherent conflict, it

16  highlights why in this case it is not.

17         Also, the case cited by both sides,

18  National Gibson --

19         THE COURT:   Uh-huh.

20         MR. HUTTON:   -- is another example where

21  the Court did find inherent conflict and it did so

22  because what the Court was asked to do in that case

23  was to construe its own orders, in terms of whether

24  the confirmation order and 524 prevented the party in

25  that case from collecting pre-petition debts.

Page 14

1          THE COURT:  Uh-huh.

2          MR. HUTTON:  And I think there are two --

3    if there were no state law issues involved, the Court

4    was being asked strictly to enforce its own order,

5    interpret the Bankruptcy Code, I think that's another

6    example, but here -- and there's another example,

7    Gandy, from the Fifth Circuit where there are issues

8    of extraterritorial jurisdiction and there was a need

9    to perhaps enforce jurisdiction over assets

10   transferred to a foreign country.

11         THE COURT:  Uh-huh.

12         MR. HUTTON:  That's another example.  None

13   of these circumstances are present here.  What you

14   have is a case, and that's why I gave you some of the

15   background.

16         THE COURT:  Uh-huh.

17         MR. HUTTON:  This is a case more than two

18   and a half years after it was filed, more than two

19   years after all the assets were sold, the issues in

20   this, if you look at all the allegations, the factual

21   issues that the Court's going to be asked to address,

22   or the arbitrator's going to be asked to address, are

23   not bankruptcy issues.

24         THE COURT:  It's a collection issue.

25   Okay.  I understand that argument.

1          MR. HUTTON:  So we don't think there is

2    any conflict whatsoever, much less an inherent

3    conflict because they're really and truly the issues

4    that are being addressed here and in the State Court

5    which is also subject to a motion to compel

6    arbitration that's going to be heard on November 1st,

7    are really issues, not everyday issues the Court --

8    this Court necessarily deals with, but issues of

9    accounting standards obligations, under Generally

10   Accepted Accounting Standards, what those -- how those

11   obligations apply in this case, whether those

12   obligations were met and so on.

13          THE COURT:  Well, what about Mr. Cimo's

14   argument, at least indirectly by citation of cases

15   that the trustee isn't even bound by the arbitration

16   provisions because this is a right that exists outside

17   of the agreement, and therefore, the arbitration

18   provisions, putting aside for a minute the missing two

19   years, the arbitration agreement wouldn't apply?

20          MR. HUTTON:  Well, if -- is Your Honor

21   referring to the cases that talk about fraudulent

22   transfer actions as not debtor --

23          THE COURT:  No, let's forget about the

24   cases relied on.  What I want to know is what is your

25   position on the trustee's argument that because the

1    cause of action that's being pursued is a bankruptcy

2    specific cause of action, I believe the trustee cites

3    among other cases the HR Certified case, but because

4    the cause of action is outside the contract, it's a

5    bankruptcy cause of action, that the trustee is not a

6    party to the -- for purposes of this lawsuit, is not a

7    party to that engagement letter, and therefore, the

8    arbitration provision doesn't even apply?  So we never

9    get to the standard of when the Court should or should

10   not defer to the arbitration provision.  So what is

11   your response to that argument?

12          MR. HUTTON:  Well, the response, Your

13   Honor, and this is where we've invoked the equitable

14   estoppel argument --

15          THE COURT:  Uh-huh.

16          MR. HUTTON:  -- because we think that, you

17   know, yes, the trustee in his capacity here nominally

18   asserting a fraudulent transfer claim is not standing

19   in the shoes of the debtor, ostensibly is standing in

20   the shoes of the creditors who would have had the

21   right under state law to assert a fraudulent transfer

22   claim.

23          THE COURT:  Uh-huh.

24          MR. HUTTON:  And they cite the Third

25   Circuit opinion, Hayes, and our response to that and

Page 17

1    what those cases have not considered and what the

2    trustee doesn't address here is the equitable estoppel

3    argument, and I think that's an important --

4            THE COURT:  That you shouldn't be able to

5    rely on the contract and then step outside the

6    contract in terms of getting the relief.

7            MR. HUTTON:  Yes, Your Honor, that's

8    correct.  And the lead case that we cite for that is

9    Andersen versus Carlisle, which is a 2009 Supreme

10   Court case.  And that was an action with investors and

11   a tax scheme sued a management firm, a law firm, an

12   accounting firm and related individuals alleging

13   fraud, negligence and other claims after the IRS said

14   that the tax scheme that they had set up was an

15   illegal tax shelter.  And the defendants, all of them,

16   the management firm, the accounting firm, the law firm

17   invoked an arbitration clause that is -- was only in

18   the investment management agreement with the

19   management firm.

20           The Sixth Circuit said categorically that

21   non-signatories are not entitled to the benefits of an

22   arbitration agreement, but the Supreme Court reversed

23   and said that that's not correct, that non-signatories

24   can invoke an arbitration clause where relevant state

25   law permits.  And there's a number of grounds that the

Page 18

1   Supreme Court indicated exist under relevant state law

2   for non-signatories to assert the benefits under

3   contract which include equitable estoppel, and the

4   Supreme Court said that because traditional principles

5   of state law allow a contract to be enforced by and

6   against non-parties to the contract through

7   assumption, piercing the corporate veil, alter ego,

8   incorporation by reference, third party beneficiary

9   theories, waiver and estoppel, the Sixth Circuit's

10  holding that non-parties to a contract are

11  categorically barred from Section 3 of the FAA relief

12  was error.  In fact --

13          THE COURT:  Isn't that just what Judge Ray

14  said in Certified, was that because the parties

15  seeking arbitration did not show, that the trustee was

16  bound under any of those state law theories that

17  arbitration was not applicable?  And in Certified

18  wasn't the party relying on the same issues?  In other

19  words, there was a contract seeking fraudulent

20  conveyance based on malpractice.

21          MR. HUTTON:  Your Honor, I'm candidly not

22  familiar with Judge Ray's opinion in Certified.

23          THE COURT:  Uh-huh.

24          MR. HUTTON:  I would note that there

25  are --

Page 19

1          THE COURT:  Maybe I'm giving the wrong

2     name.  No, Certified.  That's right.  Uh-huh.  Okay.

3     Go ahead.

4          MR. HUTTON:  I would note that even before

5     the Supreme Court opinion, contrary to the Sixth

6     Circuit, there are a number of Eleventh Circuit

7     opinions that recognize equitable estoppel, including

8     McBro Planning and Development from 1984.

9          THE COURT:  Uh-huh.

10         MR. HUTTON:  And Blinko versus Greentree

11    Servicing.  In fact, Blinko is interesting.  It's a

12    recent 2005 opinion, because neither party was

13    actually a party to the arbitration agreement.  They

14    were husband and wife borrowers that asserted RESPA

15    claims against a successor servicer that actually

16    bought the rights to the note and mortgage out of the

17    Canseco bankruptcy.

18         THE COURT:  Uh-huh.

19         MR. HUTTON:  The servicer revoked the

20    arbitration clause and the note, which the husband

21    signed but the wife did not.  And the husband and wife

22    argued that servicing is a separate function and does

23    not arise out of the note.  And also that because the

24    wife never signed the note, that she was not bound by

25    the arbitration provision that was contained only in

Page 20

1    note, it was not in the mortgage.

2           The Eleventh Circuit held two things:

3    Number One, that the arbitration clause was broad

4    enough to encompass the RESPA claims at issue because

5    the servicing function arises out of holding the note

6    and the obligations, the statutory obligations that go

7    along with that.

8           And, secondly, that it was enforceable

9    versus the wife, even though the wife was not a

10   signatory, because she was equitably estopped from

11   claiming the benefits on the note and it's such that

12   she would also be bound by the burdens of that note

13   which do include arbitration.

14          So, we think that the Equitable Estoppel

15   Doctrine is one that's well-founded -- not only

16   required to be recognized under the recent 2009

17   Supreme Court decision in Andersen versus Carlisle,

18   but is also one that's well-founded in Eleventh

19   Circuit case law.  And also, because the Supreme Court

20   refers to state law, the BDOC versus B-case is also

21   relevant, and that's the situation where a former

22   partner bought a claim against the BDO partnership

23   seeking retirement benefits.

24          And although the partner didn't sign the

25   agreement he relied upon the agreement establishing

Page 21

1   his claims and he signed previous agreements that had

2   the same arbitration language, the Court held that the

3   claims were subject to arbitration under the Doctrine

4   of Equitable Estoppel.

5          THE COURT:  Uh-huh.

6          MR. HUTTON:  And here, Your Honor, what

7   we're asserting is that when the trustee is asserting

8   claims against BDO and does so based upon the duties

9   and obligations that it had to perform the audits in

10  accordance with Generally Accepted Accounting

11  Standards in the United States, as it agreed it would

12  do on the engagement letters --

13         THE COURT:  Uh-huh.

14         MR. HUTTON:  -- and alleges that it failed

15  to perform to those standards, that the trustee is

16  equitably estopped from denying or refusing to

17  arbitrate as contained in those same agreements.

18         THE COURT:  Okay.  Well -- okay.  So

19  you're differentiating if the cause of action arose

20  separate from the agreement.  Let's say a BDO partner

21  committed a separate crime or a separate torte for

22  which the debtor had a cause of action.

23         MR. HUTTON:  I think --

24         THE COURT:  You would differentiate it,

25  because then you're not looking to the contract.

Page 22

1           MR. HUTTON:  I mean, I think that is a

2    separate issue, that's not the point I was making now,

3    but I think that is another issue.

4           THE COURT:  Uh-huh.

5           MR. HUTTON:  Because when you look at --

6    for example, they cite Hayes and Company --

7           THE COURT:  Uh-huh.

8           MR. HUTTON:  -- the Third Circuit opinion,

9    which did not, you know, by the way consider equitable

10   estoppel, the issue wasn't raised, it wasn't argued.

11   It was decided ten years before the Supreme Court

12   decision in Andersen versus Carlisle --

13          THE COURT:  Uh-huh.

14          MR. HUTTON:  -- and the issue just wasn't

15   presented, but even if it was, if it had been raised,

16   I'm not sure if it would have applied in that case

17   because it dealt with a brokerage agreement with

18   Merrill Lynch the debtor had and the customer

19   agreement had an arbitration clause in it.

20          THE COURT:  Uh-huh.

21          MR. HUTTON:  The trustee alleged certain

22   security law violations for churning an account and

23   fraudulent transfers relating to that churning.  The

24   claims in the case were based upon the representations

25   that were made by -- supposedly by Merrill Lynch to

1    the debtor customer, you know, in terms of types of

2    investments that would be made --

3                    THE COURT:  Right.

4                    MR. HUTTON:  -- and so on, not based upon

5    expressing any duties or obligations under the

6    customer agreement.  In fact, one of the things that

7    the debtor tried to do during the case was to assume

8    the customer agreement, but the Court said, no, we're

9    not going to do that.  That's not executory.  There

10   are no obligations under our agreement and the

11   arbitration clause is enough --

12                    THE COURT:  Right.

13                    MR. HUTTON:  -- alone, was enough to make

14   it executory.

15                    THE COURT:  Uh-huh.

16                    MR. HUTTON:  So the Court did, in that

17   case, order arbitration of all claims other than 544,

18   but again, the Court did not consider equitable

19   estoppel and it's not clear that it would have applied

20   because the claims are not based upon representations

21   made in the customer agreement.  It was based upon

22   separate verbal representations that were made

23   concerning the type of investments that were being

24   made to the brokerage firms' clients in that case, you

25   know, in terms of the accounts.

1           THE COURT:  Uh-huh.  Okay.  I'm going to

2    stop you.  One more question and then you need to sit

3    down because it's already been a half hour.

4           Mr. Cimo states that you do not -- you

5    failed to include the October 4th through September

6    5th and the October 7th through September 8th

7    agreement.  So, does that mean that there were none in

8    existence?

9           MR. HUTTON:  Not at all, Your Honor.  And

10   let me address and clarify that for you.  What we have

11   attached to the complaint and to the State Court

12   complaint that's attached to the motion to compel

13   arbitration is, first of all, a letter -- an

14   engagement letter dated March 18th, 2008 that pertains

15   to the audit done as of September 30th as to the audit

16   for the year ending September 30th, 2007.

17           THE COURT:  Right.

18           MR. HUTTON:  And there was after that,

19   Your Honor will recall this case as I mentioned, filed

20   on June 30th, of 2008, so I don't think there was a

21   postpetition letter for the year ending December 30th,

22   2008.

23           THE COURT:  Okay.  So you're saying --

24           MR. HUTTON:  There is a --

25           THE COURT:  -- there is a letter for the

Page 25

1    first period, but not for the second; is that what

2    you're saying?

3              MR. HUTTON:  Well, what I'm saying is that

4    there are letters that we attached for the audit years

5    ending 2007, 2006 and 2004.

6              THE COURT:  Uh-huh.

7              MR. HUTTON:  The only audit year for which

8    we did not attach an engagement letter was for the

9    audit year ending September 30th, 2005.

10             THE COURT:  Okay.  And the reason was why?

11             MR. HUTTON:  The reason, obviously after

12   we saw the response and we went back and checked and

13   we spoke with the -- my colleague spoke with the

14   engagement partner at BDO today, we were told that

15   there is a letter, I have a draft of it.  They're

16   trying to locate the original.  It is in their

17   ordinary and customary practice to do it, and you

18   know, they believe they would not have done an audit

19   without having an engagement letter.  It's our intent

20   to -- I have the draft, it was dated December 14th,

21   2005.  It's out intent to supplement the record with

22   the original.  I don't know if it's the trustee's

23   contention that there was none or that, you know,

24   simply, you know, that we failed to attach it.

25             THE COURT:  Okay.  Well, that's an open

1    issue then.  Okay.  Thank you, Mr. Hutton.

2            All right.  Mr. Cimo, anything you want to

3    highlight before you address the issues raised by

4    Mr. Hutton and I ask the questions that I have?

5            MR. CIMO:  Yes, Judge, very briefly.  It

6    did take a half hour because he had to explain away

7    the fact what's very simple, which is, this is an

8    action under 544 and 548 of the Bankruptcy Code.

9    These claims did not exist until the petition was

10   filed.

11           For Mr. Hutton to argue that equitable

12   estoppel applies when these claims could only be filed

13   in Bankruptcy Court, is beyond absurdity.  These are

14   not state law claims.  726 is only applied under the

15   Florida Fraudulent Transfer Statute vis-a-vis 544.

16   When you go to my complaint, this is an action

17   asserting rights under 544 and 548.  544 allows us to

18   go back four years, 548 allows us to go back two

19   years.

20           Moreover, I assure you if we sought

21   arbitration and didn't file these in front of the

22   Bankruptcy Court, they would be seeking to dismiss

23   them as the arbitration panel not having any

24   jurisdiction to be deciding claims under Section 544,

25   548 of Bankruptcy Code.  So we filed this lawsuit the

Page 27

1   only place where we could file it.  We couldn't file

2   it in  State Court.  We couldn't file it in the

3   arbitration Court.  We could only file it here.  And

4   the rational for this is aptly explained and not

5   reversed by a Supreme Court case in our response

6   papers and the Third Circuit case that we cited, which

7   if you turn to Page --

8            THE COURT:  Are you talking about Hayes?

9            MR. CIMO:  -- 6 of 14 of our brief, this

10  is the rational of the Third Circuit in Hayes versus

11  Merrill Lynch, quote, "Such claims are not derivative

12  to the bankrupt.  They are creditor claims of the

13  Bankruptcy Code, that the Bankruptcy Code authorizes

14  the trustee to assert on their behalf.  The Supreme

15  Court has made it clear that it is the parties to an

16  arbitration agreement who are bound by it, and whose

17  intentions must be carried out.  Thus, there is no

18  justification for binding creditors to an arbitration

19  clause with respect to claims that are not derivative

20  from one who is a party to it."  It follows, "That the

21  trustee cannot be required to arbitrate its Section

22  544(b) claims and that the District Court was not

23  obligated to stay them pending arbitration."

24            He's trying to basically stick a square

25  peg in a round hole.  We don't think equitable

1  estoppel could ever apply under these circumstances,

2  and we've cited other cases that clearly state for the

3  proposition -- again, we don't think these have all

4  been modified by the Supreme Court opinion, that

5  fraudulent transfer claims are core claims.  That

6  they're creatures of statute.  This is on Page 7 of 14

7  of my brief; that are solely for the benefit of

8  creditors of the debtor.  And as such, are not

9  arbitratable.  Part of preferential transfer claims

10  are not arbitratable.  National Gypsum, core

11  declaratory judgment claim is not arbitratable.  And

12  then Mintze, extent, validity and priority of liens is

13  not arbitratable.

14         If you take away these core claims from

15  the Bankruptcy Court, non-bankruptcy judges or

16  non-District Court judges sitting in bankruptcy are

17  going to be deciding core issues that Congress has

18  clearly delineated can only be decided by the

19  Bankruptcy Court.

20         So, we don't think there's a lot of

21  argument here on what the cases say.  We agree with

22  you that the trustee is not a party to the agreement

23  and we believe that under the core analysis and the

24  fact that these claims only existed when the

25  bankruptcy case was filed, we don't understand how

Page 29

1  equitable doctrines can apply and take away

2  jurisdiction that only exists before this Court by

3  virtue of a doctrine which is equitable in nature and

4  cannot apply to statutory claims under the Federal

5  Bankruptcy Code.

6           THE COURT:  All right.  Well, I'm confused

7  now, Mr. Cimo, and I didn't state that the trustee was

8  or was not a party.  I asked Mr. Hutton to answer the

9  question as to that.

10          In the Electric Machinery case, which is

11  an Eleventh Circuit case, as you know, the

12  Whiting-Turner versus Electric Machinery, which is a

13  2007 case, the Eleventh Circuit addressed the issue of

14  whether and under what circumstances a Bankruptcy

15  Court must defer to the Federal Arbitration Act.

16          MR. CIMO:  Yes.

17          THE COURT:  And the first issue that the

18  Court had to decide, although the Court found to the

19  contrary, was whether or not the litigation for which

20  the arbitration right had been asserted was core.  And

21  the Court in that case defined core, let's see, I

22  can't find the exact quote but essentially it's a

23  cause of action that only exist in bank -- oh, here we

24  go.  It's Toledo citing its own decision, stated, if

25  the proceeding involves a right created by the federal

Page 30

1   bankruptcy law it is a core proceeding.  Okay.

2           MR. CIMO:  Yes.

3           THE COURT:  So, your argument about 544

4   and 548 that it's a core proceeding is consistent with

5   what the Eleventh Circuit in the Whiting-Turner case

6   says is a core proceeding.

7           MR. CIMO:  Correct.

8           THE COURT:  Okay.  So then we look at,

9   again, in the same opinion -- oh, God, it's so hard to

10  read this.  This is why I like the old-fashioned way.

11  I think it's Page 797 or 796.  The Court, in looking

12  at Judge Williamson's decision states the following in

13  looking at this core issue, again.  It says, however,

14  whether or not the Bankruptcy Court has jurisdiction,

15  even exclusive jurisdiction, over a matter is a

16  separate question from whether enforcing a valid

17  arbitration agreement would pose an inherent conflict

18  with the underlying purposes of the Bankruptcy Code.

19  And then the Court goes on to establish a test.

20          The Court says, one, that you have to

21  distinguish between core and non-core.  That's the

22  first thing the Eleventh Circuit says.  And then the

23  Court says that with respect to non-core, that

24  generally, the Bankruptcy Courts do not have

25  discretion to decline to enforce an arbitration

1   agreement relating to a non-core proceeding.

2          Then the Eleventh Circuit goes on to say,

3   and here's the second part of the test, however, even

4   if a proceeding is determined to be a core proceeding,

5   the Bankruptcy Court must still analyze whether

6   enforcing a valid arbitration agreement would

7   inherently conflict with the underlying purposes of

8   the Bankruptcy Code.

9          So, I understand your argument and with

10  all sincere, respect and admiration for Judge Ray, I

11  read Whiting-Turner as bypassing this issue of a core

12  proceeding being one that is not derivative of an

13  agreement, that that does not seem to be the test to

14  the Eleventh Circuit.  And I'm not saying what I would

15  do in the absence of that language, but it seems to me

16  that the Eleventh -- I mean, it seems very clear to me

17  that the Eleventh Circuit bypasses that completely and

18  says, that is not the analysis.  It's not core or

19  non-core.

20          MR. CIMO:  Absolutely.

21          THE COURT:  I mean, that's not what

22  decides whether the arbitration agreement is binding.

23  So, it would seem to me that for purposes of the

24  Eleventh Circuit and the Whiting-Turner decision, what

25  I would have to look at in terms of determining

1  derivative, in other words, does it relate to the

2  agreement, putting aside the equitable estoppel

3  argument, okay, is -- does the cause of action flow

4  from the contract rights.  And that, to me, is the

5  decision as to whether it's subject to the arbitration

6  clause.  So that's -- so my first question to you,

7  Mr. Cimo, is, I've read your complaint and the way I

8  read the complaint is that it is based on the

9  negligent performance, or the gross misperformance, by

10  BDO of its obligations under the agreements.  That is

11  the reason why a reasonably equivalent value was not

12  delivered.

13          MR. CIMO:  It's based in part on that.

14          THE COURT:  Right.  So my question is,

15  because I know you mentioned the actual fraud.  Okay.

16  So, one, I need to know where in the complaint are

17  there allegations that do not have any relationship to

18  the engagement reflected -- the engagement of BDO

19  pursuant to the engagement letters, putting aside by

20  the way for a minute that there might be gaps, and I

21  will tell you now, that if there was no valid

22  engagement letter with an arbitration provision that

23  year is a different situation.  And then we talk about

24  staying non-arbitrable provisions.  So, show me -- I

25  have the complaint here in front of me, Mr. Cimo, if

Page 33

1    you give me a moment.

2              MR. CIMO:  Yes, more than happy to.

3              THE COURT:  And, I'm sorry gentlemen, but

4    you're just going to have to get comfortable and put

5    your feet up, or go find a coffee place.  We'll be

6    done eventually.

7              MR. CIMO:  On Page 5.

8              THE COURT:  Okay.  So on Page 5.

9              MR. CIMO:  Of the complaint.

10             THE COURT:  Of the complaint.

11             MR. CIMO:  We articulate management's,

12   acts and omissions.

13             THE COURT:  Okay.  What paragraph, I'm

14   sorry?

15             MR. CIMO:  This is the actual Section B.

16   I'm reading the title of the section.

17             THE COURT:  Okay.  Yes, I see it.

18             MR. CIMO:  We incorporate a separate

19   section into the complaint, after the history and

20   business operations of the debtor.

21             THE COURT:  Right.

22             MR. CIMO:  And it has a B, Capital B,

23   called Management's acts, omissions and breaches of

24   fiduciary duty, and intent to hinder or delay

25   creditors.

1            THE COURT:  Right.

2            MR. CIMO:  And then set forth what

3    management did.

4            THE COURT:  Uh-huh.

5            MR. CIMO:  So, the alternative basis for

6    relief has nothing to do with the engagement letter,

7    but has everything to do with aiding and abetting the

8    conduct of the debtor's principals in breaching their

9    fiduciary duties.  And there's a separate claim in

10   here for actual intent to hinder or delay.  And the

11   fact that what the acts and omissions that BDO engaged

12   in assisted those principals in aiding them in breach

13   of their duties.  And we believe those exist apart

14   from whatever agreement this entity had with the

15   debtor estate.

16           We also submit to you that this is one of

17   those claims that didn't exist until ultimately the

18   bankruptcy was filed, and that, although it is true

19   that you have to look at it under the Eleventh Circuit

20   case whether it arises or relates out of the

21   agreement, these actual intent allegations of the bad

22   conduct of the debtors is well outside professional

23   malpractice, and rises to the separate tort of aiding

24   and abetting breach of fiduciary duty, potentially

25   conspiracy to aid and abet breach of fiduciary duty

1 is clearly outside of the four corners of an

2 arbitration provision.

3           THE COURT:  Does that cause of action

4 exist in Florida?

5           MR. CIMO:  Aiding and abetting does exist

6 in Florida.

7           THE COURT:  And the breach of fiduciary

8 duty?

9           MR. CIMO:  Absolutely.  Aiding and

10 abetting, breach of fiduciary duty does exist under

11 Florida law, but we believe though that because we

12 could not file this 548 action anywhere else, we don't

13 believe the Eleventh Circuit addressed this issue of,

14 what if we file this before  the arbitrators.  I

15 submit to you they would have moved to dismiss and

16 said the arbitrators have no jurisdiction to hear a

17 548 claim or a 544 claim which is not a shoe-stepping

18 claim --

19           THE COURT:  Uh-huh.

20           MR. CIMO:  -- but a claim that only exists

21 when the petition is filed, and once the petition is

22 filed, then you have to weigh those new rights that

23 come into existence with the rights that derive under

24 these contracts that have these arbitration

25 provisions.

Page 36

1          THE COURT:  Well, I think what the

2    Eleventh Circuit says I have to do is whether

3    enforcing the agreement would inherently conflict with

4    the underlying purposes of the Bankruptcy Code.

5          MR. CIMO:   And we think the answer is

6    yes, because the underlying rationale and thrust of

7    544 and 548 is to have one forum decide who is

8    disgorging fraudulent transfers, and if we start

9    allowing arbitrators to decide who disgorges

10   fraudulent transfers, then we could have creditors

11   outside of bankruptcy filing their own fraudulent

12   transfer actions saying that they want to become the

13   estate representative to avoid and recover fraudulent

14   transfers.

15          THE COURT:  But then doesn't that tie into

16   a conflict with the Hayes decision in that only the

17   trustee can bring those actions and not a creditor?

18          MR. CIMO:  I was in a case called Swirn

19   before Judge Cristol where Judge Cristol did rule that

20   only the trustee as the representative of the estate

21   can do so, but there is countervailing law which the

22   Eleventh Circuit hasn't ruled on yet --

23          THE COURT:  Uh-huh.

24          MR. CIMO:  -- that says until that

25   judgment gets entered to avoid a fraudulent

1   transfer --

2          THE COURT:  Uh-huh.

3          MR. CIMO:  -- any creditor can file a

4   motion or a complaint to avoid a fraudulent transfer.

5   Imagine what a horrible result that would be.

6          THE COURT:  Well, let's just hope the

7   Supreme Court doesn't get ahold of it.

8          All right.  So, my understanding,

9   Mr. Cimo, is your argument is that with respect to the

10  aiding and abetting, while the aiding and abetting

11  might have been made possible by the fact that BDO was

12  under contract with Cardiac, that that cause of action

13  is not derived from the agreement whether -- so, it's

14  not an arbitratable provision?

15         MR. CIMO:  Well, I think the arbitration

16  provision -- I have to answer your question directly.

17         THE COURT:  Uh-huh.

18         MR. CIMO:  The arbitration provision is so

19  broad that if somebody had a hangnail and they stubbed

20  it on a door at the debtor's premises and it had

21  something to do with BDO, they would argue that that's

22  arbitratable.  That's how broad it is.

23         THE COURT:  Uh-huh.

24         MR. CIMO:  But I will tell you that when

25  you asked the question to me of the type of conduct

1    that's in conflict with the Bankruptcy Code, there's

2    nothing more in conflict with the Bankruptcy Code than

3    the right of a fiduciary, whether it be a

4    debtor-in-possession or a trustee, to recover and

5    disgorge monies from a fraudulent transferee, nothing

6    more sacred under the Bankruptcy Code than that.

7              And if we're going to go to this equitable

8    estoppel, this judicial common law concept to override

9    a statutory provision, we've just enacted a new in

10   pari delicto concept that's going to apply to trustees

11   on arbitration provisions where even though you have a

12   statutory claim that you can only bring in Bankruptcy

13   Court, let's create a judicial doctrine to stop you

14   from litigating it in the one forum where you could

15   file it, and we respectfully submit because this claim

16   could only be filed before the Bankruptcy Court, there

17   can't be any rule that says this has to be

18   arbitratable, and to try to argue common law or the

19   Eleventh Circuit standard to say that this has to

20   weigh in favor of what the provision says, completely

21   belies and undermines the statutory provisions that

22   permit the trustee, as the sole representative of the

23   estate, to avoid and recover fraudulent transfers.

24              THE COURT:  Well, what about the fact that

25   your action in State Court for the $6 million

1   encompasses the return of the fees?

2           MR. CIMO:  We don't dispute that, but at

3   the end of the day, that's a disgorgement action under

4   common law and that may ultimately not be decided by

5   the State Court or the arbitrators.  They may very

6   well say, that's more appropriately done in a

7   bankruptcy proceeding, but we're not going to not

8   assert a disgorgement claim --

9           THE COURT:  Uh-huh.

10          MR. CIMO:  -- just because we had a right

11  to do so under the Bankruptcy Code.  We don't believe

12  asking for that relief is adequate to make the estate

13  whole in the event it is determined that that

14  disgorgement claim for whatever reason should not be

15  permitted, whether we don't meet the elements under

16  state law, et cetera.

17          The fact remains, when a fiduciary asserts

18  a statutory claim that only he or she can assert --

19          THE COURT:  Uh-huh.

20          MR. CIMO:  -- far be it from someone to

21  argue that because we have similar relief in a State

22  Court that we can't go forward, we think that totally

23  undermines the purpose of 548 and 544.

24          THE COURT:  Okay.  Well, let's put aside

25  the breach of fiduciary duty or the aiding and

1  abetting the breach of fiduciary duty for a moment.

2  I'm going to assume, number one, that that cause of

3  claim under whatever name you call it has not been

4  alleged in the complaint in the State Court.

5        MR. CIMO:  There is a claim for aiding and

6  abetting in the State Court.

7        THE COURT:  Okay.  So you asked for aiding

8  and abetting in State Court.

9        MR. CIMO:  Yes.

10        THE COURT:  Okay.  And --

11        MR. CIMO:  By the way, that's my

12  recollection.  I don't have the State Court complaint

13  in front of me.  If it's attached, I believe when I

14  drafted that complaint we added a count for aiding and

15  abetting.

16        MR. HUTTON:  Your Honor, I can represent

17  to the Court it is part of the -- it's Count 2 in the

18  State Court.

19        THE COURT:  Okay.  All right.  So you have

20  an aiding and abetting count and then you've asked for

21  -- so, these are not causes of action, you might call

22  them something different, but they're not claims that

23  you could not have made in the State Court action,

24  which I understand the Court hasn't ruled on that

25  arbitration provision yet.

1          MR. CIMO:  When you say these claims, you

2   mean the ones that are in front of you today?

3          THE COURT:  I'm saying the facts giving

4   rise to the claim, not the title that you put --

5          MR. CIMO:  We fully concede that the facts

6   that we've asserted in the State Court are the same

7   facts -- virtually identically the same facts that

8   we've alleged here.  We're not contesting that there's

9   any difference, but we are saying is that under the

10  actual intent prong --

11         THE COURT:  Uh-huh.

12         MR. CIMO:  -- which we don't have in State

13  Court, there's a different set of criteria that are

14  employed that are unique and that which require of you

15  going outside of the four corners of the arbitration

16  provision.

17         THE COURT:  Okay.  Now, if the State Court

18  or the arbitrators of the State Court action

19  determined that BDO was not negligent or grossly

20  negligent or whatever, would you still have a claim

21  for aiding and abetting breach of fiduciary duty?

22         MR. CIMO:  Possibly.  I've never seen

23  that, but it's very possible that they can determine

24  that they've met the standard of care and yet acted in

25  a manner that aided and abetted separate conduct of

Page 42

1   the principals which resulted in aiding and abetting

2   liability.  It's unlikely, but there's a possibility

3   that they could still aid and abet and still discharge

4   their duties under the code that governs that

5   profession.

6          THE COURT:  So, you have no obligation to

7   intervene when a man is being murdered, but even if

8   you do nothing wrong, you could be found liable for

9   aiding and abetting --

10          MR. CIMO:  I don't think it works that

11  way.  I think you have to look at every act and

12  omission on a case by case basis, and an expert may

13  say that X was not a violation of the rules of

14  professional conduct, but B -- but conversely it did

15  aid and abet because of knowledge and substantial

16  assistance, and this substantial assistance may have

17  been something more than issuing an audit opinion.

18          The point is, it's unlikely that that will

19  happen, but it could happen.  There could be a

20  scenario where the jury comes out and says, not

21  professional negligence, but there seemed to be aiding

22  and abetting a breach of fiduciary duty.

23          THE COURT:  Okay.  Well, let me ask about

24  this, you have a count for actual intent to defraud.

25          MR. CIMO:  No, we don't use the word

Page 43

1   defraud.

2              THE COURT:  I'm sorry.

3              MR. CIMO:  We use intent to hinder or

4   delay.

5              THE COURT:  Intent to hinder or delay

6   creditors.  Okay.  And the basis for your allegations

7   of the actual intent is?

8              MR. CIMO:  Badges of fraud analysis.

9              THE COURT:  Well, I'm just trying to find

10  that, and that goes to the breach of fiduciary duty

11  claims?  In other words, your badges of fraud are --

12             MR. CIMO:  Paragraph 45.

13             THE COURT:  25 not 45.

14             MR. CIMO:  Paragraph 45.

15             THE COURT:  Oh, Paragraph 45.  Okay.

16  Well, it says the debtor made the 2004 to 2008

17  transfers with the actual intent to hinder or delay

18  creditors.  I'm just trying to understand how paying a

19  professional, no matter how poorly they allegedly

20  performed, would translate into an actual intent to

21  hinder or delay creditors.

22             MR. CIMO:  That's a fair question.  It's a

23  case that I lost in Model Imperial case, a bank

24  provided value, lots of value to Model Imperial, and

25  the Court said the value you provided you don't get

Page 44

1   credit for because you're not a good faith transferee.

2          THE COURT:  Yeah, but I know the facts of

3   that case pretty well, Mr. Cimo.

4          MR. CIMO:  Every case has a different --

5          THE COURT:  Right.  What I am saying is

6   that in that case the Court found that there was

7   actual knowledge by the debtor and the bank with

8   respect to loan provisions that didn't allow the loan

9   to be made.

10          MR. CIMO:  The Court found that Hamilton

11  Bank was on inquiry notice that there was something

12  about the transactions which would be a fraudulent

13  transfer.

14          THE COURT:  Okay.

15          MR. CIMO:  And it's an inquiry notice

16  standard.  It's not the trustee's burden to establish

17  a lack of good faith.  It's the transferee's burden to

18  establish that they were in good faith, and when a

19  professional does more than just either fall below the

20  standard of care or have knowledge of specific issues

21  which would render the transfer avoidable, we believe

22  that that case law in the Model decision regarding

23  good faith could be applicable to professionals

24  equally as it is to a bank or any other creditor

25  dealing with the debtor.

Page 45

1          THE COURT:  But what I'm trying to

2   understand is that you're suggesting that the debtor

3   paid a professional that didn't deserve to be paid and

4   that's a grounds for actual intent to hinder or delay

5   creditors?

6          MR. CIMO:  No, we're claiming that in

7   order to determine whether the transfers were made

8   with actual intent, they needed to get clean audited

9   opinions from their accountants, and to the extent the

10  accountants worked with management, in this

11  particular case the allegation is the receivables were

12  overstated, that these receivables were overstated and

13  banks loaned on those receivables thinking the

14  receivables were worth more than they really were,

15  created a scenario where the debtor was not acting

16  appropriately.  He was acting with actual intent to

17  hinder or delay certain creditors.

18          And when you do a badges of fraud

19  analysis, whether there's lack of insolvency, not

20  paying its debt as they became due, insufficient value

21  because there were allegations that the auditing

22  services were less than stellar, it raises factual

23  issues whether these transfers were made with actual

24  intent to hinder or delay.  We're not making any

25  allegation that there was any intent to defraud.

1          THE COURT:  Okay.  Let me ask you one

2   other question and then I'm going to ask Mr. Hutton

3   for a brief response.

4          Why shouldn't I continue the hearing on

5   this, in other words, wait and see what the State

6   Court does, I mean, what is gained if the State Court

7   either denies or grants the motion to arbitrate,  why

8   shouldn't this matter, whether I grant the motion to

9   arbitrate or not, be stayed pending resolution of

10  those other issues, so that you're not litigating in

11  two courts the exact same factual issues?

12         MR. CIMO:  Well, when you get into issues

13  of judicial economy, et cetera, and whether or not

14  this action should be stayed, we respectfully believe

15  that those issues are not ripe for a determination

16  right now until we see what happens not only on the

17  arbitration motion in State Court, but whether any

18  appeal which comes out of that may be resolved because

19  one party may not like what happens from that and that

20  may be an appealable order.

21         We just don't think that justice should be

22  delayed while that process is going forward and until

23  there's more information about where these cases are

24  going, we have a right, we believe, to go forward on

25  this action and if we win on this case, it could very

1  well be it could bring about a quicker resolution of

2  the State Court case because we're going to try issues

3  in this case that are no doubt related to what's

4  happening in the State Court, but the fact remains, if

5  we could have filed these in State Court, we could

6  have very well, but we couldn't.  So, because that's

7  the case, why should we be delayed in prosecuting our

8  claim if we have a right to prosecute these claims.

9           In any event like Mr. Hutton stated, this

10  will be heard by the Article 3 judge sitting in

11  bankruptcy, not by you because of the jury trial

12  demand, but at the end of the day the trustee has a

13  right to try to disgorge those transfers.  And for all

14  I know, they might write a check to us, if you deny

15  the stay motion, for that $200,000 and change mooting

16  out this entire complaint, meaning all that will be

17  left is the State Court case.  I will tell you, we

18  will do everything we can to coordinate discovery in

19  regard to both cases.  It's not our intention -- I'm

20  on a contingency.

21           THE COURT:  Uh-huh.

22           MR. CIMO:  It's not my intention to take

23  four or five depositions of the same person.  We want

24  to do everything we can to promote judicial economy.

25  We just don't believe being stopped in our tracks to

Page 48

1    disgorge a fraudulent transfer should be employed at

2    this early stage of the proceeding, and this adversary

3    is still at its early stages, although I do concede

4    the underlying bankruptcy case has been around for a

5    little bit of a while.

6              THE COURT:  Okay.  Thank you.

7              MR. CIMO:   I also wanted to add that --

8              THE COURT:  Yes, sir.

9              MR. CIMO:   -- we don't think dismissal is

10   appropriate under any circumstances because our

11   statute would have expired.  So if you are going to do

12   anything in terms of granting relief, we don't want

13   the case dismissed.  If you going to allow us to

14   arbitrate, we just want that arbitration.

15             If that's what your decision is, we want

16   that stature to be deemly complied with if we're the

17   ones that have to file the arbitration proceeding.  We

18   don't want to be punished because at the end of the

19   day this is one of those claims where we filed within

20   the two years --

21             THE COURT:  Right.

22             MR. CIMO:   -- and it will not be timely if

23   we're required to dismiss this and file a separate

24   arbitration proceeding.

25             THE COURT:  Well, I don't think that they

Page 49

1    asked for a dismissal.

2              MR. CIMO:  Some cases permit it, I just

3    want to point that we, you know --

4              THE COURT:  No, that wouldn't happen.

5              MR. CIMO:  Thank you, Judge.

6              THE COURT:  All right.  Mr. Hutton,

7    anything that you want to respond to?

8              (Thereupon, The Court reporter changed her

9    paper and a discussion was held off the record.)

10             THE COURT:  All right.  So, are you ready?

11             Court REPORTER:  Yes, Your Honor.

12             THE COURT:  So, Mr. Hutton, any brief

13   response?

14             MR. HUTTON:  Yes, Your Honor.  And I'm

15   glad Your Honor raised or asked about the actual fraud

16   issue because --

17             THE COURT:  Well, but Mr. Cimo said there

18   is no request for actual fraud, it's intent to hinder

19   or delay.

20             MR. HUTTON:  Intent to hinder or delay.

21             THE COURT:  Okay.  But that's different.

22             MR. HUTTON:  Actual intent, I should say.

23   Because we, too, saw the, you know, one sentence

24   allegation in Paragraph 45, but nothing else that we

25   could find that related to that, certainly no express

Page 50

1    badges of fraud alleged anywhere in the complaint, and

2    so I sort of scratched my head in terms of, you know,

3    where that came from other than another attempt to

4    avoid arbitration of these claims.

5           Then, I think, Mr. Cimo tried to tie it in

6    with the aiding and abetting management issue, and so

7    I went back and looked at those allegations of the

8    complaint, while he was speaking, and it turns out

9    that those two mirror allegations that are in the

10   State Court, because in State Court and Mr. Cimo said,

11   well, these claims can only be brought here.  That's

12   not so.  They were, the aiding and abetting claim was

13   brought in State Court.  In fact, I think that's where

14   they're seeking a ruling, because they're not just

15   seeking to recover the fees paid, they're seeking

16   damages in excess of $6 million.

17          But if you compare the allegations that

18   are made in this complaint, in Paragraphs 23 through

19   28(g), they are verbatim the same as the allegations

20   that support the aiding and abetting claim in the

21   State Court, in the amended complaint it's Paragraphs

22   28 and 32 through 38(g).  But I think there's a

23   disconnect between saying that BDO aided and abetted

24   management's breaches of fiduciary duty and saying

25   that by paying fees to BDO there is some actual intent

Page 51

1    to hinder delay or defraud.  I think there's a

2    disconnect there and I don't think these

3    allegations --

4              THE COURT:  Hinder or delay, no defraud.

5              MR. HUTTON:  I think there's a disconnect

6    between saying, well, BDO somehow aided and abetted

7    management's breaches of duty.

8              THE COURT:  By being incompetent?

9              MR. HUTTON:  By not catching certain acts

10   in terms of, you know, the statement of receivables or

11   what, you know, the things that are alleged here, in

12   saying, I think it's a separate issue, whether

13   payments that were made to BDO, the $215,000 that was

14   paid for auditors over four years was management or

15   the debtor, the intent to hinder or delay creditors by

16   making those payments.  I don't see how the allegation

17   they've made regarding the aiding and abetting count

18   which mirror those in State Court relate to the

19   payments of those transfers that are really the only

20   thing at issue in the adversary complaint.

21             THE COURT:  Okay.

22             MR. HUTTON:  So I think there's a

23   disconnect there.  The --

24             THE COURT:  Okay.  What about Mr. Cimo's

25   argument that equitable estoppel can't apply because

Page 52

1   his cause of action can't exist outside of Bankruptcy

2   Court?

3            MR. HUTTON:  Well, it actually does.  The

4   -- this is 544.  It -- they rely upon 726, and this

5   action could have been brought by creditors outside of

6   bankruptcy.  In fact, they allege that there are

7   actual creditors that existed that could have brought

8   the claim, that's a necessary element of the cause of

9   action they're asserted.

10           THE COURT:  Uh-huh.

11           MR. HUTTON:  So it did exist.  I think the

12  issue is those creditors were nonsignatories to the

13  agreement.  Our answer to that is equitable estoppel

14  because they relied upon the agreement establishing

15  the claims.

16           THE COURT:  Okay.

17           MR. HUTTON:  And, you know, to the extent

18  that Hayes said, that Mr. Cimo said, the parties to

19  the  arbitration agreement are bound, well, we would

20  submit that in Andersen vs Carlisle the Supreme Court

21  held otherwise and said that, it's not necessary just

22  the parties to the arbitration agreement, and the

23  Supreme Court -- as we referenced, there is Eleventh

24  Circuit authority, McBro and the other cases we've

25  cited, that recognized that even in situations where

1    neither party is a party to the arbitration agreement

2    equitable estoppel principles can apply and --

3                    THE COURT:  Okay.

4                    MR. HUTTON:  -- and require the

5    application of the arbitration provision, and we think

6    that's certainly the case here.

7                    THE COURT:  Okay.  Thank you.

8                    MR. HUTTON:  One last thing?

9                    THE COURT:  Very briefly.

10                   MR. HUTTON:  Very very brief.

11                   THE COURT:  Because now I'm running an

12   hour behind schedule.

13                   MR. HUTTON:  There was a comment or a

14   concern about discovery in arbitration.  Assuming,

15   and I'm not the expert in arbitration, but I conferred

16   with some of my colleagues who do it, and I am told

17   this would be a complex arbitration.  I have a copy of

18   the arbitration rules if Your Honor would like to see

19   them.

20                   THE COURT:  Please no.

21                   MR. HUTTON:  Where claims are in excess of

22   a million, there is discovery and discovery typically

23   is allowed in arbitration.  So, if there's any concern

24   about not being able to get discovery in an

25   arbitration proceeding, that should not be cause for

Page 54

1    concern.

2              And the second thing I want to mention is

3    that BDO has already produced its work papers to the

4    trustee.  The Kluger firm served a Rule 2004 request

5    back in  February of 2009 and I understand that BDO

6    produced all its work papers in response to that 2004

7    subpoena, so -- and I can assure Your Honor discovery

8    of something we'd want in the arbitration as well.

9              THE COURT:  Okay.  All right.  Is this

10   binding arbitration?

11             MR. CIMO:  Yes.

12             THE COURT:  Okay.  So, it will have

13   collateral estoppel effect?

14             MR. HUTTON:  Yes, Your Honor.

15             MR. CIMO:  Yes, Judge.  We believe it

16   will.

17             THE COURT:  Okay.  All right.  I'm going

18   to grant the motion to stay -- well, no.  Let me back

19   up.  I'm going to grant the motion to compel

20   arbitration subject to the following:  If the

21   arbitrators determine that they do not want to

22   adjudicate these issues and merely the facts, okay,

23   then we will come back here at such time as the

24   arbitration is completed, continue with this

25   litigation, but with whatever collateral estoppel

Page 55

1  effect the ruling of the arbitrators or wherever you

2  litigate this, whatever impact those have.

3          And for the reasons, I don't want to

4  repeat myself too much, but as I said, my reading of

5  the Whiting-Turner versus Electric Machinery case in

6  my view compels me to do as I've described earlier,

7  which is in determining whether the matter is

8  arbitrable, whether it's core or noncore, I have to

9  look at the derivation of the causes of action rather

10  than the nature of the cause of action, because if the

11  -- as I said before, if the delineation is core versus

12  noncore, then Whiting-Turner just doesn't make sense.

13          And so, because of that and because of

14  that causes of action that are alleged in the

15  complaint all derive from the allegations of negligent

16  or gross performance of the engagement letters, those

17  would be subject to arbitration under the terms of the

18  letter, and notwithstanding that while I do appreciate

19  Mr. Cimo's argument that this would -- that granting

20  this motion would inherently conflict with the

21  underlying purposes of the Bankruptcy Code, in this

22  particular instance, and I'm not saying that this

23  would apply in every case in which there's a

24  fraudulent conveyance action or every case in which

25  there is well, 544, 548, I'm just saying in this

Page 56

1   particular case, the purposes of the Bankruptcy Code

2   which are to achieve recovery by the trustee of assets

3   that the trustee believes -- well, assets or the

4   liquidation of claims that the trustee has the right

5   to assert on behalf of creditors, that by granting the

6   motion to arbitrate does not conflict with the

7   underlying purposes of the Bankruptcy Code in this

8   case, and I just want to make this very clear.  I

9   believe that this decision has to be made on a case by

10  case basis, not on a cause of action by cause of

11  action basis.

12          And so, therefore, I am going to grant the

13  motion, but as I said before, I want to make very

14  clear that if the arbitrators decline to adjudicate

15  the issues rather than the facts relating to the

16  issues, we will come back here at the appropriate

17  time, and so I will grant a stay, not a dismissal, but

18  a stay of this litigation pending the conclusion of

19  the arbitration however it concludes.

20          MR. CIMO:  Judge, there is no arbitration

21  yet.  There's a motion to compel in the State Court.

22  I just wanted to clarify that for you.

23          THE COURT:  Right, so -- but I'm granting

24  the motion to compel in this case.  Now, we have do

25  have the issue of those two missing or one missing

1  engagement letter.  There is case law, which, of

2  course, I cannot find right this second because I

3  forgot to write it down, that says that even when

4  there are nonarbitrable provisions, but they are

5  entwined with the arbitrable provisions, that the

6  Court can defer on those matters subject to

7  resolution, and it appears to me that if the State

8  Court grants the motion to compel and all of the

9  allegations are being resolved by the arbitrators,

10  that it's appropriate to compel arbitration.

11          On the other hand, if the State Court

12  determines that a portion of the complaint is not

13  going to be arbitrated, then my motion to stay -- my

14  granting of the motion to stay stands and we will wait

15  until the conclusion of the State Court proceedings

16  and again come back here at such time as is

17  appropriate to determine how the resolution of the

18  State Court action impacts the causes of action that

19  are here.

20          So, Mr. Hutton, I'm going to ask you to

21  prepare the order and share your draft with Mr. Cimo.

22  It can be as simple, if you gentlemen wish, as for the

23  reasons stated on the record and then just put what

24  we're going to do and I think that should be fine.

25          MR. HUTTON:  Thank you, Your Honor.  I

Page 58

1    will do so.

2                  MR. CIMO:  Thank you, Judge.

3                  THE COURT:  All right.

4              (Thereupon, the hearing was concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 59

1                          CERTIFICATION

2

3    STATE OF FLORIDA )

4                     )

5    COUNTY OF MIAMI-DADE)

6

7         I, Carmen E. De La Cruz, Shorthand Reporter

8    and Notary Public in and for the State of Florida at

9    Large, do hereby Certified that the foregoing

10   proceedings were taken before me at the date and place

11   as stated in the caption hereto on Page 1; that the

12   foregoing computer-aided transcription is a true

13   record of my stenographic notes taken at said

14   proceedings.

15

16

17              WITNESS my hand this 20th day of October,

18   2010.

19

20

21                    _____

22                    Carmen E. De La Cruz

23                    Court Reporter and Notary Public

24                    DD545111 Expiration Date 08/2011

25